IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>A.M.D-L. | No. 85138-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — The court issued a 180-day involuntary commitment order for A.M.D.-L., a teenager with a history of severe mental health issues and substance use. A.M.D.-L. claims the court erred by determining that involuntary commitment was the only option because evidence supports that he would voluntarily enter inpatient treatment. However, testimony by A.M.D.-L., his mother, and a psychiatric nurse practitioner provided substantial evidence to support the court's findings that A.M.D.-L. did not want inpatient treatment and would not voluntarily enter inpatient treatment. The 180-day involuntary commitment was the only means of ensuring A.M.D.-L. would receive the necessary treatment. Therefore, we affirm.

FACTS

A.M.D.-L. is a teenager who struggles with severe mental health issues including major depressive disorder, unspecified substance use disorder, unspecified disruptive impulse control disorder, autism spectrum disorder, and

attention deficit hyperactivity disorder. He lives with his mother in Section 8 housing.

A.M.D.-L. has a history of suicide attempts and drug overdoses resulting in hospitalizations. In August 2022, A.M.D.-L. overdosed on fentanyl at home. First responders administered Narcan and transported him to Seattle Children's Hospital (SCH). After discharge from the hospital, A.M.D.-L. left drug paraphernalia by a garden outside the family's apartment. When his mother and a social worker confiscated the items, A.M.D.-L. screamed about wanting to kill himself and then grabbed a knife from the kitchen and chased them. A.M.D.-L. "started crying that he wanted to commit suicide, that he wanted to die."

On September 23, 2022, A.M.D.-L. was voluntarily admitted to SCH's Psychiatry and Behavioral Medicine Unit (PBMU) "because he was a danger to himself and others." By early November 2022, A.M.D.-L. was no longer willing to remain hospitalized voluntarily. On November 8, 2022, a designated crisis responder filed a petition for initial detention of a minor, alleging continuing "aggressive, violent, and risky behaviors." A.M.D.-L. "threatened to harm others, caused property destruction, was physically violent with staff, tried to harm himself, and he continues to lack insight into his behaviors." He tested positive for THC[1] with suspected use of substances while hospitalized. SCH petitioned for 14 days of involuntary treatment on November 15, 2022. A.M.D.-L. agreed to the 14-day commitment on December 22, 2022.

---

[1] Tetrahydrocannabinol.

Because SCH's PBMU is a crisis stabilization unit that typically treats patients for seven to 10 days, it does not have the capacity for "more longstanding, ongoing work." However, A.M.D.-L. was denied from "essentially every referral" for treatment programs—both in Washington and out of state—due to "the significance and severity" of his behavior. SCH was working to transition A.M.D.-L. to the Children's Long-term Inpatient Program (CLIP) facility for treatment, including family engagement and a "step down process" to integrate back into the community.

SCH subsequently petitioned on December 30, 2022, for 180-day involuntary treatment, alleging "an extensive history of psychiatric hospitalizations, high lethality suicide attempts, violent behaviors towards self and others, and property destruction." A.M.D.-L. also continued to exhibit drug-seeking behavior while hospitalized, "as evidenced by [a] recent attempt to smoke his medication when he gained access to a lighter."

After hearing testimony from a psychiatric nurse practitioner from SCH's PBMU, A.M.D.-L., and his mother, the trial court granted the petition for 180 days of involuntary treatment. A.M.D.-L. appeals.

## DISCUSSION

Medical professionals from the Inpatient Psychiatry Unit of SCH filed a petition for 180-day involuntary treatment of A.M.D.-L. For a 180-day commitment of a minor:

> The court must find by clear, cogent, and convincing evidence that the minor:
> (i) Is suffering from a mental disorder or substance use disorder;

3

(ii) Presents a likelihood of serious harm or is gravely disabled; and
(iii) Is in need of further treatment that only can be provided in a one hundred eighty-day commitment.

RCW 71.34.750(6)(a). Clear, cogent and convincing evidence "means the ultimate fact in issue must be shown by evidence to be 'highly probable.' " In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). "Generally, where the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." Id. Substantial evidence is evidence sufficient to persuade a fair-minded person that the premise is true. In re Det. of A.M., 17 Wn. App. 2d 321, 330, 487 P.3d 531 (2021). For the clear, cogent and convincing standard, the findings must be supported by substantial evidence in light of the "highly probable" test. LaBelle, 107 Wn.2d at 209. We evaluate the evidence in the light most favorable to the petitioner, the State. A.M., 17 Wn. App. 2d at 330.

A.M.D.-L. does not contest the court's findings that he suffers from a mental disorder[2] and presents a likelihood of serious harm. Nor does he argue that treatment other than inpatient care at CLIP is appropriate. Rather, A.M.D.-L. challenges the court's determination that a 180-day commitment order was the only available option to ensure necessary treatment. According to A.M.D.-L., the 180-day order "was not the 'sole' or 'exclusive' option" because "the record demonstrates voluntary treatment was a viable option." A.M.D.-L. supports this

---

[2] The court found that A.M.D.-L. "suffers from behavioral health disorders." A "behavioral health disorder" means a mental health disorder or substance use disorder as defined by RCW 71.34.020, or co-occurring mental and substance use disorders. RCW 71.34.020(9).

argument with evidence from the record that he filled out the CLIP voluntary application, indicated he was looking forward to the CLIP program, repeatedly asked for updates on his application, and expressed hope that he could move to CLIP soon.

The court determined that "a less restrictive treatment alternative is not appropriate nor in Respondent's best interests because the evidence shows he is too symptomatic to comply and would be unable to keep himself safe, which does not bode well for compliance with a less restrictive treatment order at this time." The court noted that A.M.D.-L. had said that he did not want any more treatment. In assessing A.M.D.-L's expressed desire to go to CLIP, the court was "not convinced that he would actually—when a CLIP bed become[s] available, voluntarily go . . . if he's released from the hospital at this time and waiting a bed." The court based this conclusion on testimony from A.M.D.-L.'s mother and the nurse practitioner.

The nurse practitioner testified that A.M.D.-L's expressions of intent to enter CLIP voluntarily have been "very back and forth." She said, "There has been expression of going voluntarily. There's always been numerous statements about not needing further treatment." In fact, the day before the commitment hearing, A.M.D.-L. told the nurse-practitioner he "didn't need any more treatment." He also said that felt he was mentally stable and that ongoing treatment was not necessary. When the nurse-practitioner told A.M.D.-L. of her concerns about his high-risk behavior, including suicide attempts, A.M.D.-L responded that the behavior happened in the past and he would not be engaging

5

in the behavior moving forward. The nurse-practitioner testified that "the message that [A.M.D.-L.] was telling me is that ongoing treatment following the hospital wasn't necessary." A.M.D.-L.'s mother testified that similarly, A.M.D.-L. told her "that he just wants to see his friends and have fun with his friends, and he doesn't seem to think that he needs any more treatment. He thinks that he's gotten all the help he needs at Children's Hospital, PBMU." The nurse-practitioner noted concern that if A.M.D.-L. "were to go voluntarily, that [he] would also leave voluntarily very quickly."

A.M.D.-L. expressed to the court that he did not want to be "held against my own will." He testified that he was willing to go to CLIP and would continue his application to CLIP if he were released. But A.M.D.-L.'s testimony demonstrates that he was resistant to inpatient treatment in general. He said he would continue to pursue CLIP but "I'm not going to like it." A.M.D.-L. said, "I feel like I should be given more options" and wanted to explore other outpatient treatment. His explanation for self-harming behavior while inpatient at SCH provided insight into his preference for outpatient care: "I feel trapped inside of here and I feel like it's just not good for me to be not in my life. I'm just stuck here against my own will . . . ."

Because CLIP—whether entered voluntarily or involuntarily—is an inpatient facility, while there, A.M.D.-L. would again "be not in [his] life." Even if at points A.M.D.-L. indicated he would go voluntarily, testimony from all three witnesses, A.M.D.-L., his mother, and the nurse practitioner, demonstrates that A.M.D.-L. was resistant to inpatient treatment and provides substantial evidence

6

for the court's finding that A.M.D.-L. would not voluntarily go to CLIP for inpatient treatment. Given A.M.D.-L.'s history of, and continued resistance to, voluntary treatment, the court properly concluded that a 180-day involuntary commitment was the sole option to secure A.M.D.-L. the treatment he needs.

    Affirmed.

_Chung, J._

WE CONCUR:

_Birk, J._       _Mann, J._